726 So.2d 39 (1998)
STATE of Louisiana
v.
Rudolph HAYES.
No. 98-KA-485
Court of Appeal of Louisiana, Fifth Circuit.
November 25, 1998.
*40 Margaret S. Sollars, Thibodaux, Louisiana, Attorney for Defendant/Appellant.
Paul D. Connick, Jr., District Attorney, Rebecca J. Becker, Terry Boudreaux, Caren Morgan, Vincent Paciera, Jr., Assistant District Attorneys, Gretna, Louisiana, Attorneys for Plaintiff/Appellee.
Before H. CHARLES GAUDIN, JAMES L. CANNELLA and THOMAS F. DALEY, JJ.
DALEY, Judge.
This is an appeal by the defendant who was convicted of possession with intent to distribute heroin in violation of Louisiana Revised Statute 40:966A. For reasons assigned, we affirm the defendant's conviction and life sentence.

FACTS:
Agent Donald Penny of the United States Drug Enforcement Administration testified at trial that in January 1997, he was working as part of a joint task force at New Orleans International Airport in Kenner. The purpose of this task force was to monitor the movement of narcotics and currency between New Orleans and various source cities, which are thought to supply New Orleans with narcotics.
On January 23, 1997, Agent Penny was working with another DEA agent, Mike Stedman, and an officer from the Jefferson Parish Sheriff's Office, Lieutenant Lewis, both of whom testified at trial. Agent Penny testified that he and Agent Stedman were observing the Southwest Airlines ticket counter when they saw the defendant purchase a ticket for a flight to Houston, with a return flight later that day. The officers noted that the defendant had a large amount of currency and purchased the ticket with cash, as he looked around nervously. The officers observed that the defendant did not check any luggage nor did he have any carry-on bags. The defendant was dressed in an untucked baggy flannel shirt, which hung down below his waist, and a leather jacket.
Lieutenant Lewis testified that he has attended numerous seminars on drug trafficking. He felt that the defendant fit the profile of a drug courier, based on his nervous demeanor, the fact that he paid cash for a quick round trip ticket to a source city and the absence of any type of baggage or brief case.
Agents Penny and Stedman followed the defendant to the security checkpoint. After walking through the two magnetometers, the security inspector approached the defendant to scan him with a hand held wand. The defendant began backing up and stated that he left a pouch at the ticket counter. The inspector told the defendant that he had cleared inspection and had to exit through the other doors to return to the ticket counter.
The defendant returned to the ticket counter and quickly asked if anyone had seen a pouch. The defendant looked around briefly and headed back to the gating area. He passed through the magnetometers and took a seat at the boarding area.
In the meantime, Agents Penny and Seedman called Lieutenant Lewis by cell phone and asked him to obtain a criminal background check on the defendant. Lieutenant Lewis learned that the defendant had previous narcotics arrests and was currently on parole for a narcotics conviction. Lieutenant Lewis then joined the agents at the gating area. Agent Penny and Lieutenant Lewis approached the defendant and identified themselves as police officers and asked the defendant if he would speak with them. *41 They moved 15 to 20 feet away. The defendant produced his ticket and drivers license at the officers' request. These were returned to the defendant who stated he was going to Houston to visit. The defendant denied carrying narcotics or a large amount of cash. Lieutenant Lewis then asked the defendant if he would consent to be searched. The defendant complied and they moved 25 to 30 feet to a more private area, near the pay phones.
Agent Penny performed a pat-down search on the defendant. As he searched the defendant's crotch area, he felt a foreign object bulging in the defendant's pants. When Agent Penny asked what this was, the defendant was silent. Agent Penny then asked whether this was "drugs or money" and the defendant responded "drugs." The defendant was placed under arrest and read his Miranda rights. A large, cylinder shaped package was retrieved from the defendant's pants. In response to the officers' questions, the defendant stated the package contained six ounces of heroin. As the officers were walking the defendant to their office, the defendant explained that he had given a small amount of this heroin to a friend who had used it and told the defendant it was low grade heroin. The defendant told the officers he was returning to Houston to either obtain a better grade of the drug or seek the return of his money.
The State called Mr. Edgar Dunn, an expert in forensic chemistry, who testified that he performed testing on the substance seized from the defendant. This package contained 160.51 grams of 20% pure heroin.
Officer Bruce Harrison, an expert in the use, distribution, and packaging of narcotics, was called by the State. Officer Harrison testified that heroin is sold on the street in packages of .04 grams per dosage unit. Each of these dosage units sells for $20.00 to $25.00. He concluded that 160 grams of heroin is approximately 4,000 dosage units having a street value of at least $100,000.00. He estimated that the wholesale price of this heroin was $50,000.00 to $60,000.00. Officer Harrison further testified that assuming a hard-core heroin user would use 15 dosage units per day, 160 grams of heroin would last that user about 266 days.
There was no testimony presented on behalf of the defendant. The trial judge held a hearing outside the presence of the jury to be sure the defendant understood he had the right to testify if he so desired and concluded that the defendant had waived this right.
At the conclusion of the trial, the jury found the defendant guilty of possession of heroin with intent to distribute by an eleven to one vote. The defendant was sentenced to life in prison without benefit of probation or suspension of sentence.

DISCUSSION:
In his first assignment of error, the defendant argues that the trial court erred by failing to grant his Motion to Suppress the physical evidence and his statements which were obtained as a result of an illegal seizure and arrest. The defendant contends that the officers did not have a valid basis for an investigatory stop, and that his initial encounter with officers led to an illegal arrest.
The right of law enforcement officers to stop and interrogate one reasonably suspected of criminal activity is recognized under state and federal law. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Belton, 441 So.2d 1195 (La.1983), cert. Denied, Belton v. Louisiana, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984); LSA-C.Cr.P. art. 215.1. Reasonable cause for an investigatory stop is something less than probable cause to arrest; however, it requires that officers have sufficient knowledge of the facts and circumstances to justify an infringement of an individual's right to be free of government interference. State v. Belton, supra.
Since Terry v. Ohio, supra, the United States Supreme Court has repeatedly held that mere police questioning does not constitute a seizure. In Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, (1983), the court explained that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions *42 to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions."
Each of the officers involved in the stop of the defendant were trained narcotics officers with years of experience in drug interdiction. They were specifically assigned to investigate the flow of narcotics and currency through New Orleans airport to and from known source cities, including Houston. They were specifically instructed to observe for suspect passengers purchasing airline tickets to any of the known source cities. They testified that the defendant fit the characteristics of a drug courier, i.e. using cash to purchase a round trip ticket to a source city with return on the same day, nervous demeanor, and wearing baggy clothes. Moreover, the officers were aware of the defendant's criminal history of several narcotics arrests and that he was on parole for a narcotics conviction. Accordingly, we find the officers had reasonable suspicion for questioning the defendant at the gate area.
The defendant goes on to argue that when he was asked to move to the area near the pay phones for the search, this was in effect an arrest and that any evidence or statements obtained pursuant to this arrest were improperly obtained as "fruit of the poisonous tree."
The long standing rule of law is that the state must affirmatively show that a statement or confession was given freely and voluntarily, without inducements, threats, or promises, in order for this statement or confession to be admissible at trial. LSA-C.Cr.P. art. 703D; LSA-R.S. 15:451; State v. Lavalais, 95-0320 (La.11/25/96), 685 So.2d 1048, cert denied, Lavalais v. Louisiana, ___ U.S. ___, 118 S.Ct. 85, 139 L.Ed.2d 42 (1997). The state must also prove that the defendant was advised of his constitutional right to consult an attorney and his privilege against self-incrimination, if the statement was elicited during custodial interrogation. State v. Bently, 96-795 (La.App. 5th Cir. 3/25/97), 692 So.2d 1207.
In Miranda v. Arizona, 384 U.S. 436 at 443, 86 S.Ct. 1602 at 1612, 16 L.Ed.2d 694 (1966), the Supreme Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Our state courts have developed a four-factor test to determine whether a custodial interrogation has occurred:
1. Whether there was probable cause to arrest prior to questioning;
2. Whether the statements and actions of the police indicate an intent to hold or restrain the accused;
3. Whether the accused reasonably believed he was restrained;
4. The extent to which the investigation had focused on the accused.

State v. Foret, 96-281, (La.App. 5th Cir. 11/14/96), 685 So.2d 210, 222.
The United States Supreme Court has developed an analysis which substantially undermines the four-part test used by our state courts. Under the Supreme Court test, the existence of probable cause to arrest is largely immaterial to the issue of custody, as are the subjective perceptions of either the interrogating officer or the defendant. The Court explained that the only relevant inquiry in determining whether there was a formal arrest or a restraint on the freedom of movement of the degree associated with an arrest is "how a reasonable man in the suspect's position would have understood the situation." Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). The United States Fifth Circuit recognized this conflict in United States v. Bengivenga, 845 F.2d 593 (5th Cir.1988), cert. denied, Bengivenga v. United States, 488 U.S. 924, 109 S.Ct. 306, 102 L.Ed.2d 325 (1988), and chose to follow the Supreme Court's "reasonable person" standard, rather than the state courts' four-part test. This court has recently applied the "reasonable person" standard in State v. Tate, 97-117 (La.App. 5th Cir. 5/27/98), 714 So.2d 252; State v. Pomeroy, 97-1258 (La.App. 5th Cir. 5/13/98), 713 So.2d 642.
According to the testimony at trial, the defendant willingly agreed to speak with officers. He was questioned in a public place. He responded to the officers' questions *43 that he had prior arrests for drug charges. Defendant admitted being on parole and that he had not obtained his parole officers permission to travel. We find that the defendant's freedom of movement was not restricted to the degree associated with an arrest when he was asked to move to the area by the pay phones after he consented to being searched. There was no testimony that the defendant was seized or felt that his liberty was restricted in any way. When the bulge was discovered in defendant's pants, the defendant responded that this object was drugs. At that point, the officers told defendant he was under arrest and he was advised of his Miranda rights. We find the arrest was legal and the defendant's comments about the identity and amount of the drug were admissible.
In his second assignment of error, the defendant contends the trial court erred by allowing the Bill of Indictment to be amended the day of trial by excluding the Grand Jury's reference to simple possession of heroin. The Bill of Indictment in this case originally charged the defendant with "possession with intent to distribute heroin," and cited as the governing statute "R.S. 40:966A & C." The body of the indictment alleges that the defendant "did knowingly and intentionally possess with intent to distribute a controlled dangerous substance to wit: Heroin..."
Prior to the commencement of trial, over the defendant's objection, the trial court allowed the state to amend the bill to eliminate the reference to subsection "C" of the statute, which covers simple possession of heroin.
Louisiana Code of Criminal Procedure article 464 provides:
The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.
The district attorney has the power and authority to amend grand jury indictments, as to both form and substance. State v. Neslo, 433 So.2d 73 (La.1983). Unless prejudice to the defendant results, the state may correct an erroneous statutory citation in the indictment. State v. Williams, 392 So.2d 619 (La.1980).
In this case the Bill of Indictment states, in two separate places, that the charge is "possession of heroin with intent to distribute." Based on this wording, we find the intent of the grand jury was to charge the defendant only under subsection "A" of the statute, which pertains to distribution and the state's amendment merely corrected a technical error.
In his final assignment of error, the defendant argues the trial court erred by not declaring a mistrial after evidence of other crimes was allowed into evidence through the defendant's statement. He contends that the trial court improperly admitted the testimony of Agent Penny regarding an inculpatory statement he made to officers at the time of his arrest.
At the hearing on the Motion to Suppress the confession, Agent Penny testified that as defendant was being escorted to the airport office, the defendant told the officers that he allowed a friend to try some of the heroin and this person reported that the heroin was of poor quality. The defendant explained that he was on his way to Houston to return the heroin or exchange it for a higher quality substance. During the trial when it appeared that Agent Penny would recount this statement, defense counsel objected and requested a mistrial. Defense counsel argued that the defendant's statement constituted inadmissible "other crimes" evidence and that the state had failed to supply him with notice of its intent to use this statement as required by LSA-C.Cr.P. art. 768 and LSA-C.E. art. 404(B). The state responded that not only was this statement admissible as part of the "res gestae," but compliance with the notice requirements was not necessary because testimony at the suppression hearing was sufficient to inform defendant about the statement. The defendant's objection was *44 overruled and the mistrial was denied. Defendant re-urges these arguments on appeal.
In general, evidence of other crimes is inadmissible at trial because of the risk of prejudice to the defendant. State v. Hopson, 97-509 (La.App. 5th Cir. 11/25/97), 703 So.2d 767. However, evidence of other crimes is admissible "when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding." La. C.E. art. 404B(1). Formerly known as "res gestae," evidence that constitutes an integral part of the crime is admissible without prior notice to the defense. Hopson, supra.
In State v. Girod, 96-660 (La.App. 5th Cir. 11/25/97), 703 So.2d 771, the defendant was convicted of possession of a stolen lawn mower. The prosecution was allowed to elicit information from a witness regarding a trailer that was stolen along with the lawn mower. The defendant's request for a mistrial was denied. On appeal, this Court found that the testimony at issue was admissible as an integral part of the crime charged, because it established how the defendant came into possession of the stolen lawn mower.
In the case before us, Agent Penny's testimony recounting defendant's statement established how the defendant came to be traveling to Houston with a package of heroin. Thus we hold this statement was properly admitted as part of the res gestae.
The defendant also argues that the trial court erred in allowing admission of this statement because he was not given proper notice of the state's intent to use this statement. Even if we were to find that the statement was not part of the res gestae, the defendant had sufficient notice, since the officers testified regarding the statement at the suppression hearing.
Louisiana Code of Criminal Procedure Article 768 provides:
Unless the defendant has been granted pretrial discovery, if the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the state's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence.
The purpose of this requirement that the state give notice of its intent to use an inculpatory statement is to avoid surprise, and to allow the defendant adequate time to prepare his defense in light of the inculpatory statement. State v. Billiot, 421 So.2d 864 (La.1982).
If the defendant has actual notice of the state's intent to use the statement by other means, he is not prejudiced by the state's failure to provide written notice as required by Article 768. State v. Williams, 416 So.2d 914 (La.1982); State v. Sneed, 316 So.2d 372 (La.1975). Here the defendant was provided with sufficient notice that the state would use the inculpatory statement at trial, since the officers testified regarding the statement at the Motion to Suppress held three months prior to trial. Moreover, it can be inferred from defense counsel's objection to the subject testimony even before it was elicited, that he was fully aware of the statement's content. The use of an inculpatory statement at a hearing on a Motion to Suppress affords adequate compliance with the notice requirements of Article 768. Williams, supra.
This record was reviewed for errors patent in accordance with Louisiana Code of Criminal Procedure article 920 and State v. Oliveaux, 312 So.2d 337 (La.1975). No errors patent were found.
For the foregoing reasons, the defendant's conviction is affirmed.
AFFIRMED.